# CHARLESTON.

STATE *ex rel.* H. B. HUNDLEY *et als.* v. A. E. GOODWYN *et als.*

Submitted January 15, 1919.    Decided January 28, 1919.

1. ASSOCIATIONS—*Masonic Grand Master—Jurisdiction.*

    A Grand Master of Masons within his jurisdiction has not authority to postpone, either temporarily or indefinitely, an annual communication of the Masonic Grand Lodge that elected him, where the constitution of the order designates the time and the last preceding annual communication selected the place therefor. (p. 257).

2. SAME—*Authority of Masonic Grand Master—Communication.*

    In the event of an emergency rendering undesirable or inadvisable the holding of an annual communication of a Masonic Grand Lodge at the time and place regularly appointed and selected therefor, the Grand Master may convoke a special communication of the Masonic Grand Lodge at such time and place as he may select, and, when so convoked, it alone may determine the feasibility and necessity for such postponement. (p. 257).

3. SAME—*Annual Grand Communication—"Quorum."*

    Where an association, as an incorporated Masonic Grand Lodge of Colored Masons, within its jurisdiction, is composed of an indefinite number of members, and subject to change from death, suspension or expulsion, revocation of the charters of subordinate lodges and the grant of additional charters, and the constitution of such Grand Lodge, by-laws, edicts, rules and regulations do not, nor does any rule of law or legislative provision, prescribe a con-

stitutional quorum, the members present at the time and place
regularly appointed and selected for such annual grand commu-
nication, and qualified and competent to transact the business
thereof, constitute a quorum for that purpose, though less than
a numerical majority of such body. (p. 259).

4. MANDAMUS—*Surrender of Masonic Offices.*

Mandamus lies to compel the retiring Grand Master of Masons,
the Grand Secretary and Grand Treasurer of a Grand Lodge of
Masons to surrender their offices and deliver the books, papers
and other documents, funds and other things in their possession
and under their control pertaining to such official positions, to
their successors in office, when their right thereto is established
by clear and competent proof, and the property is within the jur-
isdiction of the court awarding the writ. (p. 259).

Original mandamus by the State, on the relation of H. B.
Hundley, Grand Master of the Colored Masons, and others,
against A. E. Goodwyn, late Grand Master, etc., and others.

*Writ awarded.*

*Blue & McCabe* and *McWhorter & Carney,* for relators.
*Jo N. Kenna* and *Wm. Denny,* for respondents.

LYNCH, JUDGE:

The relators seek the aid of the writ of mandamus to com-
pel respondents to deliver to them possession of all the rec-
ords, record books, minutes, proceedings, moneys and all
other property or properties or things of any kind whatso-
ever belonging to the Grand Lodge of Colored Masons of this
state, which have come into and are in the hands of the
respondents, who claim to be officers of the lodge and who
hold the property by virtue of such claim.

The respondent, A. E. Goodwyn, was elected Grand Mas-
ter of the Colored Masons of West Virginia at the regular
annual communication—the word communication being the
Masonic equivalent of the word meeting—of the Grand Lodge
held at Clarksburg in June, 1917, and the respondents, Trent
and Hughes, respectively, Grand Treasurer and Grand Sec-
retary of the Grand Lodge, at which communication Hunt-
ington was selected as the place for the next ensuing annual
communication of the Grand Lodge, the time therefor being

fixed by the constitution thereof, at which time and place the relators claim to have been elected respectively as the successors of each of the respondents, which succession or the right thereto the latter deny, basing their denial upon the proclamation of the respondent Goodwyn as the then Grand Master of Masons dispensing with or "calling off" the Huntington communication because of war conditions then prevailing in this country.

The right to the writ depends upon the answers to three questions: (a) Whether Goodwyn as the Grand Master had authority to postpone indefinitely the holding of the communication at the time prescribed by the constitution of the order and at the place designated by the Grand Lodge in 1917; (b) whether the body assembled at Huntington was legal and constitutional as to empower it to dispatch the business ordinarily transacted by such a body when properly constituted; and if so, (c) whether the writ will lie to compel respondents to deliver to relators the property in their possession belonging to the grand body.

The Grand Lodge instituted and conducted by the colored Masons of this state is a chartered body, as the relators and respondents both concede, as they also do that the constitution of the organization requires a grand annual communication at a time definitely prescribed and at a place to be selected each year at the preceding annual communication, and that upon all questions arising upon this proceeding the principles laid down by Albert G. Mackey in his work on Masonic Jurisprudence, so far as applicable, shall govern and control.

Upon the first question presented for consideration, namely, the power of a Grand Master of Masons to postpone an annual communication of the Grand Lodge. Doubtless Goodwyn and those with whom he consulted and upon whose advice he acted reached the conclusion that as he was Grand Master, and as such the supreme head of the organization that elected him, and had the exclusive authority to preside over its deliberations, wherever and whenever convened, he also necessarily was clothed with ample authority to proclaim and thereby lawfully to effect the indefinite postponement of

the annual communication required by the organic law of the fraternity, whose duly elected and constituted chief officer he was at that time. In part the authority assumed is consistent with the authority vested in the office of Grand Master of Masons. Such an officer does, it is true, have the exclusive right to preside when present at any meeting, whether regular or special, of the Grand Lodge within his jurisdiction. That is a recognized prerogative of the office. Though a high prerogative, the conclusion predicated upon it is contrary to and violative of the principles of Masonic jurisprudence as laid down by Mackey. For he says: "The constitution of the Grand Lodge necessarily must designate a time and place for the annual communication which it is not in the power of the Grand Master to change." The constitution of the Grand Lodge organized by the colored Masons of this state designates the date but not the place for each successive annual communication, but impliedly confers, or some rule or regulation grants, or custom—it matters not which—establishes the right of each annual communication to select the place where the next one shall convene. This right of selection, however, does not affect, modify or render nugatory the positive regulation of the right claimed to defer to a later date or "call off" the 1918 communication of the grand body, as Goodwyn attempted to do. The lack of authority to effect such postponement and the reason and the purpose therefor are not the less obvious and certain because the constitution left undetermined the place of each successive annual communication. But what Mackey says in the paragraph from which we have already quoted manifestly was intended to meet the exigencies that furnished the motive for the attempted postponement; for he says: "But on the occurrence of any emergency which may in his opinion render a special communication necessary, the Grand Master possesses the prerogative of convoking the Grand Lodge, and may select such time and place for the convocation as he deems most convenient or appropriate. This prerogative has been so repeatedly exercised by Grand Masters, from the earliest times to the present day, that it seems to be unnecessary to furnish any specific precedents out of the

multitude that the most cursory reading of the old records would supply.'' Whether by this declaration of the law applicable to this phase of the controversy the author intended to say that the special communication was to supersede the annual communication and to dispatch such business as might be transacted at the latter, if convened according to the constitutional provision, is a question that does not arise and with which we are not concerned for the present, for no such special ·communication was convened.

Then what of the second proposition, namely, whether the body that assembled at Huntington at the time fixed by the constitution and the place selected therefor at the Clarksburg meeting was legally and properly constituted and authorized to transact the business proper to be transacted, had not Goodwyn attempted to postpone the regular annual communication? The constitution, it is agreed, does not prescribe what shall constitute a constitutional majority of such lodge when assembled in annual or special grand session for the dispatch of business or for any other purpose, and so far as we are informed by counsel or can discover, there is no rule of law or statutory provision which prescribes or fixes a quorum for associations of this character, except the general provision governing corporations organized for the purpose of profit, and none whatever fixing such a quorum for fraternal organizations.

Notwithstanding Goodwyn's proclamation, the representatives of ten of the thirty-seven subordinate lodges acknowledging allegiance to the Grand Master of Colored Masons, several Past Masters, a Past Grand Master, Grand Senior Deacon, Grand Pursuivant, one of the three Grand Trustees and a District Deputy Grand Master met at Huntington on June 11, 1918, and organized and held a grand communication for the dispatch of business, and thereafter continued in session for the usual length of time, and among other things elected the relator, H. B. Hundley, Grand Master of Masons within his jurisdiction, the relator, S. B. Moon, Grand Secretary, and the relator, I. M. Carper, Grand Treasurer, of the same Grand Lodge. Did the persons so convened constitute such quorum as empowered them or the

body of which they were members to do such acts as we must recognize as lawful and binding? A regular corporation, it must be conceded, is not bound by the action of a minority of its directors or stockholders, though in each instance what they did was done at the time and place fixed for such meetings for the transaction of the corporate business, but this is because of the protective provision of the statute. What would be the result in the absence of such a statute is a question with which we are not now concerned and need not answer, except to remark that the statute may have originated from the abuse of the power claimed and exercised on behalf of minorities, and it is now generally recognized that neither a minority of a board of directors nor of stockholders of a business corporation, though duly and legally convened at the proper time and place, can lawfully transact any business for the corporation. The same principle applies to any organization having a definite number of constituents or members not subject to constant change in numerical strength, for when changes of this character do occur, the record of a corporation usually discloses the succession. Masonic bodies, however, are constantly changing; the membership seldom remains the same. Some die every year, others are suspended or expelled or demitted, new members join and Masons from other jurisdictions may increase the number by affiliation, new lodges are organized, while for various reasons charters may be withdrawn from some subordinate lodges and charters granted to others, so that, as we have said, the membership of the body is constantly fluctuating, sometimes is large, at other times small. To avoid the difficulty which may arise, it is usual to fix a quorum sufficient to constitute a Grand Lodge of Masons much smaller indeed than would be required in most other organizations. As an illustration, the only other Grand Lodge of Masons in this state has fixed as a constitutional majority the representatives of five subordinate lodges, though it has jurisdiction over more than two hundred of them.

As apropos this question and as important in this connection Chancellor Kent says: "There is a distinction taken

between a corporate act to be done by a select and definite body, as by a board of directors, and one to be performed by the constituent members. In the latter case, a majority of those who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide. This is the general rule on the subject; and if any corporation has a different modification of the expression of the binding will of the corporation, it arises from the special provisions of the act or charter of incorporation." 2 Kent Com. (14th Ed.) *293. And even if a bare majority of a board of directors or the stockholders be present at a regular meeting, the corporation may, nevertheless, be bound by the acts of a minority, for then apparently the vote of a minority can determine the policy of the corporation. Thus five constitute a quorum of nine directors, and where there are only five present, three may control. The same general principles are stated by Morawetz on Private Corporations, (2nd. Ed.) Vol. 1, § 476. "In the absence of an express provision to the contrary, the rule is," the author says, "that such of the shareholders as actually assemble at a properly convened meeting constitute a quorum for the transaction of business, and a majority of that quorum have authority to represent the corporation." For this proposition he cites *Field* v. *Field,* 9 Wend. 395; *Everett* v. *Smith,* 22 Minn. 53; *Madison Avenue Baptist Church* v. *Baptist Church, &c.,* 5 Roberts. 649; *Craig* v. *First Presbyterian Church,* 88 Pa. St. 42; *Brown* v. *Pacific Mail Steamship. Co.,* 5 Blatch. 525.

The question involved upon this point may not improperly be illustrated by the case of *Rex* v. *Varloe,* Cowper 248, where the policy of a borough was to be determined by the vote of its freemen, a corporation which necessarily consisted of an indefinite number and that number subject to change from time to time; and the conclusion reached was that the major part of the freemen present, whether large or small, were entitled to act. The same principle was applied in the *Madison Avenue Church* case, cited above, for the same reason, as it was also in the case of *Craig* v. *Church,* also cited. The decision in each case was based

upon the regularity of the assemblage and of the time and place fixed therefor and the indefiniteness and uncertainty of the number of those entitled to participate. The same principle was discussed in *King* v. *Miller,* 6 T. R. 268, 101 Eng. Reprint 547; *King* .v. *Bellringer,* 4 T. R. 810, 100 Eng. Reprint 1315; 1 Cook on Stock & Stockholders (3rd. Ed.) § 607; 2 Kent's Com. *293. And while these cases deal with elections by the voters of municipal corporations or by the directors or stockholders of business corporations, they announce the principle which we think governs the question we are discussing, that wherever the constituent number is indefinite and variable,. the acts of those who assemble, although a minority, at the regular time and place provided for the assemblage and act for and on behalf of the associated body, are regular and entitled to judicial approval. Therefore it must follow that the meeting of the Grand Lodge at Huntington was regular and lawful and not subject to the criticism urged against it by respondents.

The third and last proposition, whether the writ lies or not, seems to be quite clear. Goodwyn's term of office ended; it is said, by the provisions of the constitution, by-laws, rules or regulations of the order with the expiration of the year for which he was elected, and by rotation Hundley was his regular and legitimate successor. But the cessation of his authority as Grand Master of Masons does not depend solely upon custom or legislation. He ceased to be such an officer upon the election of Hundley by a legally constituted Grand Lodge, and thereafter possessed none of the powers or the prerogatives pertaining to the former position, and hence in duty was bound to recognize the authority of his successor. And so of Trent and Carper. And there appears to be no substantial reason or excuse for his refusing obedience to the principal command of the alternative writ. Mandamus lies to compel the admission to office of a party having a clear prima facie right thereto, and as a necessary incident to compel the delivery of the appurtenances of the office. *Kline* v. *McKelvey,* 57 W. Va. 29. That such relief will be given to compel the surrender of the office to a claimant where the right seems clear, appears to be the settled policy

of this state, and as part of such relief the restoration and delivery to the rightful claimant of the property pertaining thereto. *State ex rel.* v. *James,* 73 W. Va. 753. See also *Coldwater Mining Co.* v. *Gillis,* 170 Mich. 126, Ann. Cas. 1915A, 410.

*Writ awarded.*